231 A.2d 486.

J. Gordon Douglas, Jr. *vs.* John T. Pratt, Jr. *et ux.*

JULY 7, 1967.

Present: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

446

 

Joslin, J. This civil action for injunctive and other equitable relief and for damages was tried to a justice of the superior court sitting without a jury. Judgment was for the plaintiff, and the case is now here on the defendants' appeal.

In 1957 the defendants became the owners of a large irregularly shaped tract of land which fronts northerly on Ocean Drive in the city of Newport and which is known as Price's Neck. It projects southerly into the Atlantic Ocean in the direction of Brenton's Reef and is referred to as a "promontory" or "peninsula." Three residences are located on the property: "Sea Cove," where defendants reside, is situated at the southerly end of the promontory and is closest to the ocean; "Sea Edge" is the second or middle dwelling and is occupied by plaintiff; "Sea Garden" is the most northerly of the three and the one closest to Ocean Drive. A private driveway running the length of the peninsula and approximately along its center line provides the three residences with access to Ocean Drive.

On January 4, 1962, defendants executed a warranty deed conveying a 3.2 acre portion of the tract to plaintiff and his then wife, Adelaide, as tenants by the entirety. The conveyance included "Sea Edge." The deed was recorded on April 27, 1962, and on the same day defendants leased to plaintiff and Adelaide, as tenants in common, a 1.15 acre parcel of unimproved land, also on Price's Neck. Known as the "garden plot," it is located on the opposite side of the driveway from "Sea Edge." The two conveyances, deed and

lease, were jointly negotiated, and the trial justice found them to be integral parts of a single purchase and sale transaction.

The present dispute is a by-product of plaintiff's divorce from Adelaide on November 18, 1963. On advice of counsel and as part of a property settlement, both plaintiff and his divorced wife executed and delivered a quitclaim deed conveying the "Sea Edge" property to the plaintiff's son, J. Gordon Douglas, III. Although the conveyance was unqualified and passed legal title without reservations of any kind, there was no monetary or tangible consideration, and the trial justice found that it was purposed solely on putting the bare legal title to the "Sea Edge" premises in Gordon until some indeterminate time in the future when plaintiff's marital difficulties would be so resolved as to permit him to resume ownership without concern as to possible adverse consequences. Consonant with that purpose, plaintiff, whose equitable ownership defendants do not challenge, has since the transfer enjoyed all of the benefits as well as carried all of the burdens of the ownership of "Sea Edge." Additionally, Gordon has at all material times been ready, willing and able to reconvey "Sea Edge" to his father upon request.

When defendants learned of the conveyance of the "Sea Edge" property to Gordon, they notified plaintiff that the lease had thereby been terminated, and they demanded that he remove the cedar fencing which he had, after the commencement of his tenancy, caused to be erected around the garden plot. When plaintiff failed to comply with their demand, defendants on April 1, 1966, removed the fence. Thereupon, plaintiff on April 7, 1966, commenced this action. He asked (1) that defendants be enjoined from harassing or interfering with his possession and occupancy of the garden plot and from trespassing thereon; (2) for a declaration that the lease of the garden plot is in full force and effect; and (3) for money damages of $20,000. From

a judgment granting the first two prayers and awarding money damages of $704 together with costs and interest, defendants have appealed.

The issue is whether the transfer by plaintiff and Adelaide to Gordon worked a termination of the lease. The answer to that question lies in how we interpret the termination clause of the lease. It reads as follows:

"* * * This Lease shall continue in force so long as the said Lessees shall remain the owners of the premises known as 'Sea Edge' and if said Lessees cease to be the owners of 'Sea Edge' said Lease shall terminate and said Lessees shall surrender possession to said Lessors."

What causes the difficulty is the meaning of the word "owners." While the termination date is fixed as the time when plaintiff and his then wife should cease to be the "owners" of the "Sea Edge" property, the measuring word "owners" is not defined. Now that events have occurred which perhaps were not foreseen, or if contemplated were not expressly provided for, the parties ask, notwithstanding their failure to particularize, that we fill the gap in the terms of their fully integrated written agreement.

Although the word "owners" is a common one, it is used in varying circumstances and for different purposes. It is not a word of art; it has no technical or precise definition; it does not in all cases convey a single identical meaning; its scope is general; and its variety of meanings will depend somewhat on the context or sense in which it is used. A few examples from our own cases suffice to evidence the wide application which it has received. Thus, in *Gilligan* v. *Board of Aldermen*, 11 R. I. 258, a tenant for life or for years or from year to year was deemed an "owner" within the contemplation of a statute which gave compensation to abutting owners for damages caused by change of grade in a highway; in *McKee* v. *McCardell*, 22 R. I. 71, 46 A. 181, possession and control, rather than title, were deemed the controlling criteria in passing on a declaration charging negli-

gence for injuries sustained while on the property of another; in *American Woolen Co.* v. *Town Council of North Smithfield,* 29 R. I. 93, 69 A. 293, only those seized of freehold estates were deemed "owners" within the contemplation of a statute which prohibited the granting of a license for the sale of intoxicants at any place where the owners of the greater part of the land within 200 feet of the proposed place of sale should object; and in *Albert S. Eastwood Lumber Co.* v. *Britto,* 51 R. I. 406, 155 A. 354, the sole financial interest in property, rather than ownership of record, was determinative of the validity of a mechanic's lien which the statute required should be lodged against the owner.

In this case the parties assented to a writing as an expression of their agreement. Their lease is an integrated document. *Golden Gate Corp.* v. *Barrington College,* 98 R. I. 35, 199 A.2d 586. To ascertain the meaning of the termination clause—a meaning which has been made obscure by the use of the word "owners"—we look for the intention of the parties. What the parties may have intended at some time in the past, however, is not readily ascertainable. This is especially so because their verbal manifestations have been clouded by the use of a word which has no definite or common meaning and which, depending on its context, has a widely varying purport. In these circumstances we look objectively to the other pertinent provisions of the instrument in which the word of doubtful meaning appears and we examine it as a whole, *Humble Oil & Refining Co.* v. *Lennon,* 94 R. I. 509, 182 A.2d 306; *Lehner* v. *Adam Hat Stores, Inc.,* 88 R. I. 88, 143 A.2d 313; *Shuster* v. *Sion,* 86 R. I. 431, 136 A.2d 611; we examine it contextually with the provisions of the deed to the "Sea Edge" property since that conveyance together with the lease are parts of a single transaction, *Old Kentucky Distributing Corp.* v. *Morin,* 50 R. I. 163, 146 A. 403; and we consider also all relevant and competent circumstances which were attendant upon the

making of the integrated document. *Wesley* v. *M. N. Cartier & Sons Co.*, 30 R. I. 403, 75 A. 626; *Swinburne* v. *Swinburne*, 36 R. I. 255, 90 A. 121; *Hughes* v. *Providence & Worcester R.R.*, 2 R. I. 508. The American Law Institute calls this process a "standard of interpretation" and it defines it as "* * * the test applied by the law to words and to other manifestations of intention in order to determine the meaning to be given to them." 1 Restatement, Contracts §227, p. 306.

The plaintiff argues that the parties intended that the lease should terminate only if the property known as "Sea Edge" were conveyed to an independent third party who had no connection with the Douglas family. The plaintiff's son, Gordon, he says, is not such a person. That argument presupposes that we read the termination clause as though it were written: "This lease shall continue in force so long as the Lessees or either of them shall remain the owner of a legal or equitable interest in the premises known as 'Sea Edge' and said lease shall terminate if both of said Lessees shall cease to have either an equitable or a legal interest in the ownership of 'Sea Edge'."

He claims support for such a reading in the provision which appears next before the testimonium clause. It provides: "It is understood and agreed that the terms of this Lease shall apply to and bind the heirs, executors, administrators of the respective parties." In our judgment plaintiff attaches undue importance to that clause and to its placement in the lease. Neither has any unusual significance. A clause of similar purport, although not always in language identical to that used here, is customarily found and similarly placed in leases generally. This is so whether the lease has been carefully drafted after extended negotiations between counsel skilled in the preparation of leases or contains instead the boiler plate verbiage of the standard printed form. In either event, its only purpose and legal effect is to bind the heirs, executors, administrators, suc-

cessors and assigns of each of the parties to the respective covenants, terms and agreements each may have undertaken to keep and perform. There is nothing so markedly different in the language used here or the placement at the end of the lease next before the testimonium clause as to suggest an intended purpose or a legal effect other than that which generally prevails.

The plaintiff also calls our attention to the clause in the lease which prohibits either its assignment or a subletting of the demised premises and he asks that we consider it as well as those provisions of the deed to the "Sea Edge" property which give to both the grantees and the grantors and their respective heirs, devisees and legal representatives, preferred rights of purchase in the event of a contemplated sale by the latter of the property retained by them or by the former of the "Sea Edge" property. Interpreting the termination clause within the context and in conjunction with all of these clauses including the "heirs, executors, administrators" clause of the lease, plaintiff argues that together they suggest a plan or scheme of the parties "to preserve the *status quo* on Price's Neck between the Douglas family and the Pratt family." The obvious fault with that conclusion is that the *status quo* he refers to has not been preserved, and indeed no longer exists. The Douglas family as it was on the effective date of the lease is no longer a family. The plaintiff and his wife are divorced. Adelaide, once a tenant by the entirety, now has no interest, legal or equitably in "Sea Edge." The plaintiff, formerly a holder of record with Adelaide, now has only an equitable interest in the property. The plaintiff's son, a stranger to the property at the time the *status quo* was established, now holds the legal title. This is not the *status quo* as it existed when the lease took effect.

In our judgment the word "owners" considered within the context of the entire writing of which it is a part, and in conjunction with the provisions of the deed of the "Sea

Edge" property, cannot reasonably be interpreted as including Gordon as trustee for his father.

A consideration of the relevant circumstances accompanying the transaction in no way alters that conclusion. Two different versions of what was the motivating inducement for the lease of the garden plot can be found in the record. That the conflict in the testimony was unresolved by the trial justice is of no significance inasmuch as an acceptance of either would not support the theory which plaintiff urges.

The defendants' explanation is that the lease came about because plaintiff's wife, Adelaide, an ardent rose grower, was most anxious to have a flower garden opposite "Sea Edge." The plaintiff, on the other hand, explains the lease acquisition by saying that he wanted the garden plot "for my protection" and "to round out the property."

If it was Adelaide's desire for a place to garden which led to the lease, then obviously the intention was to link termination to her continuing interest in "Sea Edge." If, on the other hand, plaintiff's desire to protect "Sea Edge" and to round out his purchase brought about the lease, the query of why the garden plot was leased rather than included within the deed conveying the "Sea Edge" property has no reasonably satisfactory answer. In short, neither version of what it was that brought about the lease will support plaintiff's position that the parties intended that the word "owners" in the termination clause should mean an equitable ownership by one tenant, rather than a legal ownership by husband and wife as tenants in common.

There is no necessity for us to decide what the parties meant when they provided that their lease would terminate if the lessees ceased to be the "owners" of the "Sea Edge" property. That question poses more difficulties than the issue before us. All we decide here is that the conveyance by the plaintiff and Adelaide to the former's son resulted in a termination of the lease.

. The defendants' appeal is sustained, the judgment appealed from is reversed in all its parts, and the cause is remanded to the superior court with direction to enter judgment in accordance with this opinion.

Motion for leave to reargue denied.

*William R. Goldberg, Moore, Virgadamo, Boyle & Lynch, Salvatore L. Virgadamo*, for plaintiff.

*Sheffield & Harvey, Richard B. Sheffield*, for defendants.