**Supreme Court**

No. 2011-303-Appeal.
(KM 03-799)

Harold Hazard                    :

                    v.           :

State of Rhode Island.           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Harold Hazard          :

v.                     :

State of Rhode Island.  :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The applicant, Harold Hazard, appeals to this Court from the Superior Court's denial of his application for postconviction relief. Hazard previously had been convicted of one count of first-degree child molestation sexual assault, in violation of G.L. 1956 § 11-37-8.1,[1] and four counts of second-degree child molestation sexual assault, in violation of § 11-37-8.3.[2] Before this Court, Hazard contends that his application for postconviction relief should have been granted based on what he argues was prejudicial error committed by his trial counsel when he provided Hazard's confidential psychiatric records to the state without his knowledge or consent, failed to attempt to limit the state's use of the psychiatric records or to object to the state's use of the records, failed to introduce the psychiatric records himself to buttress Hazard's defense, and failed to adequately prepare Hazard for cross-examination on the psychiatric records. Hazard further contends that his trial counsel was

---

[1] General Laws 1956 § 11-37-8.1 provides: "A person is guilty of first degree child molestation sexual assault if he or she engages in sexual penetration with a person fourteen (14) years of age or under."

[2] Section 11-37-8.3 provides: "A person is guilty of a second degree child molestation sexual assault if he or she engages in sexual contact with another person fourteen (14) years of age or under."

deficient because he pursued an argument at trial about racial animosity that Hazard believed should not have been used and because his trial counsel failed to object to what Hazard argues was improper credibility attacks and improper vouching during the prosecutor's closing argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I
## Facts and Travel

The underlying facts of this case are discussed at length in State v. Hazard, 785 A.2d 1111 (R.I. 2001). For the sake of brevity, this Court will only discuss those facts relevant to the issues on appeal.

# A
## Background

The incidents underlying this case occurred in 1993 and 1994. At that time, Hazard, who was divorced with three sons, lived with his fiancée, Carla, and her daughter Lisa,[3] who was between eleven and twelve years old. Hazard worked a day shift as a postal worker, and Carla was a waitress who worked an evening shift three or four nights per week from approximately 4:30 p.m. to midnight. When Carla worked evening shifts, Hazard was alone with Lisa. Hazard also cared for Lisa when Carla was hospitalized on two separate occasions, once in 1993 for over one week, and the second time in 1994 for at least two weeks.

The evidence at trial demonstrated that during the times Hazard was alone with Lisa, he began coming into her room as she prepared for bed. Her bedtime was approximately 9 p.m., at which time she would occasionally apply a moisturizing lotion. Hazard began to ask if he could put the lotion on her. At first, he applied the lotion on only her back, but eventually he began

---

[3] To protect the privacy of the complaining witness, we have given her a pseudonym.

rubbing lotion on her breasts underneath her clothing. The touching escalated to where he was licking her ears and kissing her breasts and neck, all the while explaining that he was showing her the locations of "horny spots." A number of times, he also touched her buttocks, and on three occasions, according to Lisa's testimony at trial, he "put his fingers in [her vagina] a little bit." On one occasion, he penetrated Lisa's vagina with his tongue, and on another occasion, he penetrated her anally with what he said was his thumb, but what she believed was his penis. Between 1993 and 1994, these incidents occurred, in total, about fifteen to twenty times.

Lisa did not tell her mother about Hazard's conduct because she knew that her mother was in love with Hazard and because Hazard threatened to kill himself if she did. She told her best friend about the touching in the fall of 1994, but made her friend promise not to tell anyone because Lisa was afraid. In 1994, Hazard and Carla grew apart,[4] and in September 1995, he moved out of their home. Around that time, Hazard lost three family members: his father on March 24, 1995, his sister on January 1, 1996, and his mother on January 21, 1996. He became very depressed, even making funeral arrangements for himself in February 1996, and eventually sought treatment and counseling.

On July 7, 1996, Lisa finally revealed to her mother that Hazard had touched her inappropriately. Later that same night, accompanied by a friend, Carla went to Hazard's apartment and confronted him. Hazard became visibly nervous and upset, and he started crying and shaking. He apologized and offered to pay for any therapy or counseling for Lisa. Hazard then left his apartment. The next morning, at around 8:35 a.m., a state trooper responded to a

---

[4] Hazard and Lisa's relationship took a turn for the worse as well. Lisa acknowledged that, at the outset of Hazard's relationship with Carla, she displayed some resentment toward Hazard, but she testified that she grew to like him and the two became very close. In 1994, however, Lisa's behavior towards Hazard grew defiant, and he, in turn, began to ignore her. Hazard asked Carla to change her work schedule so that she could be home with Lisa during the evenings because he did not want to babysit Lisa anymore.

call of a man down in the Veterans Memorial Cemetery, where he found Hazard face down and bleeding from slashes on his wrist. The trooper approached Hazard to gather some information about what happened. The trooper also located Hazard's vehicle, where he found Hazard's identification and a note that said, "I am sorry for all the pain I caused. Please try to forgive me. Town Hall has a copy of my DD214.[5] Hill Funeral Home has paperwork. Thank you."[6]

**B**
**The Trial**

On October 6, 1997, a jury found Hazard guilty of one count of first-degree child molestation sexual assault, in violation of § 11-37-8.1, and four counts of second-degree child molestation sexual assault, in violation of § 11-37-8.3. Hazard filed a motion for a new trial, which the trial justice denied on October 23, 1997, and on December 18, 1997, she sentenced Hazard to forty years at the Adult Correctional Institutions (ACI)—twenty years to serve, twenty years suspended, with twenty years probation—for the first-degree count, and concurrent thirty-year terms—fifteen years to serve, fifteen years suspended, with fifteen years probation—for the four second-degree counts. Hazard was required to register as a sex offender, and he was ordered to undergo sex-offender counseling, mental-health counseling, and substance-abuse counseling. The trial justice also ordered Hazard to pay restitution to Lisa for costs incurred during her counseling.

---

[5] A DD Form 214, or "DD214," is a "Certificate of Release or Discharge from Active Duty" that is issued by the United States Department of Defense upon a military service member's retirement, separation, or discharge from active duty.
[6] The note also included a separate notation addressed to Hazard's sister, Grace, that read, "Grace, have them correct the spelling on ma's and dad's grave stone."

**C**
**The Direct Appeal and Motion for Sentence Reduction**

For Hazard's direct appeal, he retained new counsel because his trial counsel had passed away. On appeal, Hazard challenged certain evidentiary rulings and the mid-trial excusal of a juror. See Hazard, 785 A.2d at 1115. The appeal was denied on December 3, 2001. Id. at 1123. Hazard then filed a motion for sentence reduction, which also was denied by the trial justice on May 10, 2002. On September 8, 2003, Hazard filed an application for postconviction relief.

**D**
**Postconviction Relief**

On May 30, 2006, a hearing was held on Hazard's postconviction-relief application. During the hearing, Hazard explained that his trial counsel had requested his authorization to release his mental-health treatment records because trial counsel was concerned for Hazard's health and mental wellbeing. He said that his trial counsel never informed him that this material would be provided to the prosecutor. As a result, Hazard maintained, he was shocked and unprepared when confronted with the records for the first time during his trial. Hazard also contested trial counsel's strategy to attack Lisa's credibility by alleging racial animus. He noted that trial counsel attempted to assign racial bias as the motive behind Lisa's accusations, but he himself never thought that Lisa resented him and he said he never agreed to this trial strategy.

On January 11, 2010, the postconviction-relief justice, who had also been the trial justice, issued a forty-eight-page decision on Hazard's postconviction-relief application. In essence, the postconviction-relief justice distilled Hazard's various arguments into two categories. The first involved areas where she found trial counsel's performance to be constitutionally deficient, thus meeting the first prong of the Strickland test.[7] Significantly, however, she found that no

---

[7] Strickland v. Washington, 466 U.S. 668 (1984).

prejudice had inured to Hazard with respect to those deficiencies, in that the outcome of the trial would not have been different if the errors had not occurred; thus, she held that the second prong of the <u>Strickland</u> test had not been met. The second category involved areas where the postconviction-relief justice found that trial counsel's performance did not fall beneath an acceptable standard, and, therefore, the arguments failed because the first prong of <u>Strickland</u> was not met.

Specifically, the postconviction-relief justice found that trial counsel's performance was deficient to a constitutional degree when he produced Hazard's psychiatric records to the state,[8] when he failed to attempt to limit the use thereof by the state, when he failed to use the records as a defense, and when he failed to properly prepare Hazard for cross-examination. The justice determined, however, that those deficiencies did not deprive Hazard of a fair trial. She further found that trial counsel's performance was not deficient in suggesting racial animus to attack Lisa's credibility or in failing to object to the prosecutor's closing argument, wherein the term "liar" repeatedly was used in reference to Hazard or when the prosecutor used his summation to bolster the credibility of the state's witnesses. Ultimately, the postconviction-relief justice denied and dismissed Hazard's application.

Hazard timely appealed the adverse decision of the postconviction-relief justice to this Court. Before this Court, Hazard contends that his application for postconviction relief should have been granted based on what he alleges were constitutionally deficient and prejudicial errors by his trial counsel.

---

[8] The parties did not conduct discovery before trial. Therefore, trial counsel was under no obligation to provide Hazard's psychiatric records to the state. There is no question that some of the material in those records was damaging to defendant.

## II
## Standard of Review

General Laws 1956 § 10-9.1-1 creates a postconviction remedy that is "available to any person who has been convicted of a crime and who thereafter alleges either that the conviction violated the applicant's constitutional rights or that the existence of newly discovered material facts requires vacation of the conviction in the interests of justice." Higham v. State, 45 A.3d 1180, 1183 (R.I. 2012) (quoting DeCiantis v. State, 24 A.3d 557, 569 (R.I. 2011)). We note that an applicant for postconviction relief must bear "the burden of proving, by a preponderance of the evidence, that [postconviction] relief is warranted" in his or her case. Anderson v. State, 45 A.3d 594, 601 (R.I. 2012) (quoting Mattatall v. State, 947 A.2d 896, 901 n.7 (R.I. 2008)). When "reviewing the denial of postconviction relief, this Court affords great deference to the hearing justice's findings of fact and will not disturb his or her ruling 'absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence.'" Higham, 45 A.3d at 1183 (quoting Brown v. State, 32 A.3d 901, 907-08 (R.I. 2011)).

When evaluating allegations of ineffective assistance of counsel, the standard employed by this Court is identical to that set forth by the Supreme Court of the United States in Strickland v. Washington, 466 U.S. 668 (1984). "Applicants are required to demonstrate that: (1) 'counsel's performance was deficient in that it fell below an objective standard of reasonableness,' * * * and (2) 'that such deficient performance was so prejudicial to the defense and the errors were so serious as to amount to a deprivation of the applicant's right to a fair trial.'" Tassone v. State, 42 A.3d 1277, 1284-85 (R.I. 2012) (quoting Lynch v. State, 13 A.3d 603, 605-06 (R.I. 2011) and Bustamante v. Wall, 866 A.2d 516, 522 (R.I. 2005)). This Court considers counsel's performance in its entirety, and "when that performance is deficient in a number of respects, then the possibility is greater that an accumulation of serious shortcomings

prejudiced the defendant to a sufficient degree to meet the Strickland requirement." Brown v. State, 964 A.2d 516, 528 (R.I. 2009).

When determining whether opinion testimony is inadmissible "bolstering" or "vouching," this Court considers whether "the opinion testimony has the same substantive import as if it squarely addressed and bolstered another witness's credibility * * *." State v. Rushlow, 32 A.3d 892, 899 (R.I. 2011) (quoting State v. Adefusika, 989 A.2d 467, 476 (R.I. 2010)). "When this Court determines that specific testimony constitutes impermissible bolstering, our task is then to determine whether the trial justice's decision to admit such improper testimony constituted prejudicial error." Id. (citing Adefusika, 989 A.2d at 476).

### III
### Analysis

#### A
#### Prejudicial Disclosure and Use of Psychiatric Records

The postconviction-relief justice found that trial counsel's conduct in relation to the disclosure of Hazard's psychiatric records fell below an objective standard of reasonableness, thus satisfying the first prong of the Strickland standard, a finding which the state does not contest. Accordingly, we focus on the second prong: whether trial counsel's deficient performance was so prejudicial that applicant was deprived of a fair trial. See Strickland, 466 U.S. at 696.

Hazard argues that the postconviction-relief justice erred when she found that the following conduct did not prejudice the outcome of his trial: (1) trial counsel's disclosure of his psychiatric records without his specific knowledge or consent, (2) trial counsel's failure to object to the use of the records or to limit their use at trial, (3) trial counsel's failure to prepare him for the prosecutor's cross-examination with regard to the records, and (4) trial counsel's failure to

introduce the records to add weight to his argument that his suicide attempt had nothing to do with the molestation charges. Hazard maintains that he was deprived of a fair trial based on these numerous deficiencies because, through the in-court disclosure of the mental-health records, his credibility was severely damaged while Lisa's credibility was corroborated. The state argues that there was an abundance of incriminating evidence presented at Hazard's trial to support the jury's verdict, and that Hazard was unable to demonstrate that any of trial counsel's errors were of such magnitude as to undermine confidence in the jury's verdict.

Under the second prong of Strickland, 466 U.S. at 696, the applicant bears the burden of proving that prejudice resulted from deficient performance. See Chalk v. State, 949 A.2d 395, 399 (R.I. 2008). To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Brown, 964 A.2d at 529 (quoting Strickland, 466 U.S. at 694).

In this case, the particular part of the cross-examination on which Hazard focuses is the prosecutor's use of one of his psychiatrist's progress notes, which referred to an admission by Hazard that he had given Lisa a bath and put lotion on her. The specific use of the psychiatric records on cross-examination of Hazard was as follows:

> "Q    Is it fair to say that [Lisa] would put lotion on?
> "A    I-- I would not know that in all honesty, sir. I did not go
>          inside of her room.
> "Q    Have you ever seen her put lotion on?
> "A    No, I did not.
> "Q    Have you ever put lotion on her?
> "A    No, I did not.
> "Q    Are you sure of that?
> "A    Yes, sir.
> "* * *
> "Q    If I told you that you told [your psychiatrist] on October 22
>          of 1996 that you did put lotion on her, what would you say?

"A      If that is what was stated, then that is what was probably
        stated.

"Q      Did you acknowledge that you stated that then?

"A      I probably did then.

"Q      Do you acknowledge that you stated that to [your
        psychiatrist]?

"A      I don't know-- what date was this--

"Q      October 22 of 1996?

"A      I don't recall, but I may have

"* * *

"Q      [After handing the document dated October 22, 1996 to
        Hazard]  May I have that document back? Does that refresh
        your recollection as to whether you ever put lotion on her?

"A      Yes, it does.

"Q      You acknowledge that you did?

"A      Yes, I do.

"Q      And in the context that you were talking to [your
        psychiatrist], you stated that you put lotion on her back
        after-- I am sorry, not on her back-- you put lotion on her
        after giving her a bath?

"A      I never gave her a bath.

"Q      You acknowledge that is what you told [your psychiatrist]?

"A      I did not tell him that.  I am sorry.  Never gave that child a
        bath."

This confrontation forced Hazard to beat a hasty retreat and retract his denial that he rubbed

Lisa's body with lotion, and it is the effect of this retreat, Hazard argues, that rendered his trial

unfair.

However, after carefully scrutinizing the record, we agree with the postconviction-relief

justice that Hazard has not met his burden of showing with reasonable probability that, but for

the alleged errors, the result of his trial would have been different.  Strickland, 466 U.S. at 694.

In our view, even if the testimony about the lotion was excluded, there is an abundance of "other

compelling evidence of his guilt that was more than sufficient for the jury to convict [Hazard]

beyond a reasonable doubt."  Brown, 964 A.2d at 541.

For example, the postconviction-relief justice observed that, as in Brown, the

complaining witness's highly persuasive testimony was the heart of the state's case.  See Brown,

964 A.2d at 529. She explained that Lisa's "testimony was corroborated by the circumstances of its disclosure, the credible testimony of her mother and friend, * * * [Hazard]'s action upon being confronted with her allegations, [and Hazard]'s lack of credibility and a credible defense." Indeed, the postconviction-relief justice noted that trial counsel "did not introduce any contradictory testimony to impeach the credibility of the complaining witness or the other witnesses," and specifically noted that despite the attempt to proffer evidence of racial animus in an effort to discredit Lisa's testimony, the jury could have reasonably inferred that Lisa was not harboring any racial animus toward Hazard at the time she made the allegations based on "the timing of [Hazard]'s acts of molestation against the young girl and her disclosure of those acts to her mother." Further, the postconviction-relief justice noted that "the trial justice instructed the jury that if it found [Lisa]'s testimony to be credible, it could return a guilty verdict on that basis alone." She concluded that these findings, together, "support[ed] the jury's verdict and ma[de] it unlikely that defense counsel's alleged errors prejudiced [Hazard] so as to undermine confidence in the outcome of his trial."

In addition to the "strong testimony from [Lisa]," the postconviction-relief justice also found that Carla provided "strong testimony" that "substantiate[d] the jury's guilty verdict." The postconviction-relief justice explained that Carla's testimony regarding Hazard's reaction to her confrontation of him was credible. Indeed, Hazard did not deny the accusation; he immediately responded, "oh my God, Carla. I am so sorry," and "it was not when you were working at night, it was when you were in the hospital." He offered to pay for any counseling that Lisa would need, and he expressed his concern about "how he was going to explain this to [his] sons." Those statements were corroborated by the testimony of Doug Arling, Carla's boyfriend at the time of trial, who had accompanied her to Hazard's apartment and who testified convincingly.

Specifically, Arling testified that Hazard never denied the accusations, but rather said that he could not believe what had happened and that he "would rather be dead than alive." Finally, Carla's testimony was further corroborated by the fact that later that same morning after his admission, Hazard attempted suicide, which tended to indicate consciousness of guilt. Indeed, the note that he left in his vehicle provided that he was "sorry for all the pain [he] caused."

Conversely, the postconviction-relief justice found Hazard's trial testimony to be patently self-serving. Indeed, she flatly disbelieved Hazard's attempts to discredit Lisa's story. For example, he claimed that Lisa was never placed in his care, that he did not babysit Lisa, that Carla worked a total of twelve nights during the whole time they were together, that he would go out with Carla on Wednesday through Saturday evenings, and that Lisa's grandparents and aunts babysat on both occasions where Carla was hospitalized. However, on cross-examination, Hazard was forced to retract these statements. When pressed about Carla's actual work schedule, Hazard acknowledged that Carla regularly worked the evening shift several times per week, presenting numerous opportunities where he was alone with Lisa. Indeed, this was corroborated by Janet Hartman, Carla's co-worker from 1993 to 1994, who testified that Carla worked an average of four evening shifts per week during the time period in question. Hazard also changed his testimony during cross-examination about when he went out at night, clarifying that he did not go out regularly with Carla on Saturdays and that it was during only the winter months that he bowled on Thursdays.[9]

In addition, although he remained adamant that he did not babysit Lisa while Carla was hospitalized, Hazard's story was contradicted by Lisa's grandmother and two of her aunts, who

---

[9] During his direct examination, Hazard originally testified that he would go out bowling with Carla on Wednesday, Thursday, and Saturday nights, and that he would go to various "night spot[s]" with Carla on Friday and Saturday nights.

testified that Hazard babysat Lisa during Carla's two hospitalizations because Lisa needed to be closer to her school.[10]   Finally, Hazard's testimony that he regularly worked overtime was undermined when the state rebutted it with the testimony of Kathy Krzanowski, the postmaster of the East Greenwich Post Office, where Hazard worked during the relevant time.  That witness testified that even though Hazard may have worked overtime past the normal end of the day shift at 3:30 p.m., it was "very, very rare" for a postal worker to work until 6:30 or 7 p.m., although Hazard had claimed that he was positive that he worked past 6 p.m.  Eventually, Hazard conceded that the amount of time he had actually been alone with Lisa "was up there," estimating it was "fifty [to] one hundred times."

Finally, the postconviction-relief justice considered the relevance of Hazard's suicide attempt.  Hazard explained that he tried to kill himself because he was still experiencing grief over the deaths of his sister and his parents, which had occurred months earlier, and from the stress arising from his job.  According to Hazard, his failed attempt to end his life had nothing to do with Lisa's allegations, and the timing, in his words, merely was coincidental.  However, as the postconviction-relief justice concluded, Hazard's attempt to resurrect his depression as the explanation for his suicide attempt was unworthy of belief.  Indeed, Lisa's testimony that Hazard told her he would kill himself if she told anyone further corroborated that his attempted suicide was a result of his consciousness of guilt.

After our review of the record and the postconviction-relief justice's decision, to which we accord great deference, we agree with her findings that revelation of the psychiatric records relating to the lotion was not enough to prejudice Hazard to the extent of undermining

---

[10] Specifically, Barbara, Carla's mother, testified that she did not babysit Lisa during the hospitalizations, while Brenda, one of Carla's sisters, testified that she cared for Lisa only on the night Carla was in the car accident and Patricia, another sister, explained that Lisa stayed with her "just for a weekend" during the hospitalizations.

confidence in the outcome of the case. Because there was such overwhelming evidence incriminating Hazard, including Hazard's own testimony that was riddled with inconsistencies, we agree with the trial justice that the unfortunate errors of counsel, which supported a conclusion of ineffectiveness, did not affect the outcome of the trial. Further, Hazard has not demonstrated how additional preparation for cross-examination would have changed his testimony, such that it would have affected the outcome of the case. Accordingly, because Hazard has failed to meet his burden of proving how his trial counsel's failure would have affected the outcome of the case, his claim for relief predicated on the ineffective assistance of counsel must fail.

**B**
**Deficient Representation**

Hazard also argues that the postconviction-relief justice erred in concluding that trial counsel was not ineffective to a constitutional dimension when he: (1) attempted to suggest racial animosity towards him to attack Lisa's credibility, (2) failed to object to the prosecutor's attacks on Hazard's character during the prosecutor's closing argument, and (3) failed to object to the prosecutor's vouching for the credibility of Lisa and her mother during the prosecutor's closing argument. We will address each argument in turn.

**1**
**Use of Racial Animosity**

First, Hazard argues that he did not believe that Lisa harbored any animosity towards him based on his race, and, as a result, he disagreed with his attorney's use of this as a tactic. He maintains that the assault on Lisa's credibility by alleging racial animosity was so obviously weak that it was objectively unreasonable for his trial counsel to pursue this line of attack.[11] The

---

[11] Lisa and Carla are caucasian, and Hazard is of color.

state responds that trial counsel's strategy of presenting the jury with a motive for Lisa's accusations is common in cases that center on credibility, and, therefore, it does not constitute ineffectiveness.

It is well settled that judicial scrutiny of counsel's performance must be highly deferential. In Strickland, 466 U.S. at 689, the Supreme Court of the United States cautioned against "second-guess[ing] counsel's assistance after conviction or adverse sentence"; "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." This Court has also made clear that "mere tactical decisions, though ill-advised, do not by themselves constitute ineffective assistance of counsel." Bustamante, 866 A.2d at 523 (quoting Toole v. State, 748 A.2d 806, 809 (R.I. 2000)). "A fair assessment of counsel's performance, therefore, 'requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Jaiman v. State, 55 A.3d 224, 238 (R.I. 2012) (quoting Strickland, 466 U.S. at 689). "It should also be borne in mind that one who claims ineffective assistance of counsel must overcome the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.'" Lyons v. State, 880 A.2d 839, 842 n.5 (R.I. 2005) (quoting Strickland, 466 U.S. at 689).

Here, the postconviction-relief justice found that trial counsel's attack on Lisa's credibility was a reasonable tactical decision. She also found that, based on the strength of the evidence against Hazard, there was no prejudice resulting from this decision. We agree. The Sixth Amendment does not guarantee a right to counsel "who would blindly follow [a

defendant's] instructions." Bustamante, 866 A.2d at 524 (quoting State v. Thornton, 800 A.2d 1016, 1029 n.14 (R.I. 2002)). Indeed:

> "A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. A defendant is not entitled to an attorney who agrees with the defendant's personal view of the prevailing law or the equities of the prosecutor's case. A defendant is entitled to an attorney who will consider the defendant's views and seek to accommodate all reasonable requests with respect to trial preparation and trial tactics. A defendant is entitled to appointment of an attorney with whom he can communicate reasonably, but has no right to an attorney who will docilely do as he is told. Every defendant is entitled to the assistance of counsel dedicated to the proposition, and capable of assuring that, the prosecution's case shall be presented in conformity with the Constitution, rules of evidence and all other controlling rules and practices. No defendant has a right to more." Bustamante, 866 A.2d at 524 (quoting United States v. Moore, 706 F.2d 538, 540 (5th Cir. 1983)).

Hazard has come forward with no evidence demonstrating that trial counsel's tactical decision was objectively unreasonable or so prejudicial to his defense as to amount to a deprivation of his right to a fair trial. Accordingly, we hold that Hazard was not deprived of his right to effective counsel as to this claim.

## 2
### Failure to Object to Credibility Attacks

Hazard also argues that the postconviction-relief justice erred in finding that trial counsel's failure to object to the state's closing argument was not constitutionally deficient. Specifically, Hazard argues that the prosecutor wrongfully referred to him as a "liar" nineteen times during the course of his closing remarks. The state argues, however, that the prosecutor's description of Hazard as a "liar" was not an infringement on the jury's function, nor was it

otherwise improper, because the prosecutor used the term only after he first highlighted evidence that suggested Hazard was, in fact, lying.

While "referring to a witness as 'a liar' by counsel in his summation" can be "violative of the fair trial concept," we have held that this rises to the level of an improper credibility attack "when such reference is unrelated to anything in evidence." State v. Plante, 111 R.I. 386, 390, 302 A.2d 804, 806 (1973). If a prosecutor points to the evidence on which he bases his attack on a defendant's veracity, and as long as he does not imply that he was privy to information of which the jury was unaware, the categorization of a defendant as a liar is not impermissible. Id. at 391, 302 A.2d at 807.

In this case, the postconviction-relief justice concluded that trial counsel's failure to object to the references to Hazard as a liar was not constitutionally deficient performance that was unduly prejudicial to him at trial. She did, however, observe that "[t]his [c]ourt certainly does not condone the prosecutor's references in his closing statement to [Hazard] as a liar, as they were impermissible opinion statements of the prosecutor, could imply special knowledge on the part of the State, usurped the jury's role in determining credibility and were highlighted through repetition." To support this, the postconviction-relief justice cited numerous cases, including State v. Horton, 871 A.2d 959, 965-66 (R.I. 2005) and State v. Simpson, 658 A.2d 522, 527-28 (R.I. 1995). We disagree with the postconviction-relief justice on that point, because in those cases, this Court strongly disapproved of the prosecutors' use of the terms "monster" and "scum" to describe defendants in their closing arguments. Horton, 871 A.2d at 965-66; Simpson, 658 A.2d at 527-28. Because these tactics "serve[d] to demonize a particular defendant," we admonished the prosecutors. Horton, 871 A.2d at 965. In our opinion, suggestions that a defendant may have lied during his testimony, if based on the evidence, do not rise to that level.

We stress again that personal attacks on defendants should be avoided. Nonetheless, Hazard has failed to show that the prosecutor's references to him as a liar were improper. In this case, the credibility of Hazard's testimony was a critical issue to be decided by the jury. Hazard put his own character and credibility at issue by taking the stand, and the prosecutor's closing argument that suggested he could be a liar was an attempt to contrast Hazard's testimony with other evidence in the case. Before the prosecutor referred to Hazard as a liar, he highlighted several instances where his testimony had been refuted or contradicted, including his testimony (1) that he did not put lotion on Lisa, (2) that his depression was the reason for his suicide attempt, (3) that he did not molest Lisa, (4) that he confronted Carla about Lisa's allegations, (5) about his work schedule, (6) about Carla's work schedule, and (7) about his schedule for bowling and other recreational activities. Because the prosecutor based his opinion regarding Hazard's veracity on the evidence that was presented to the jury, and because he did not suggest that his beliefs stemmed from reasons or knowledge outside the record, it is our opinion that the prosecutor's statements in this case were not improper. See State v. Conway, 463 A.2d 1319, 1324 (R.I. 1983). Accordingly, we hold that trial counsel's failure to object to these statements was not constitutionally deficient.

Moreover, even if the remarks by the prosecutor were improper, we recognize that trial counsel's decision not to object may have been made for tactical reasons. Indeed, at times counsel may refrain from raising an objection because it "might only draw the jury's attention to damaging facts that it might otherwise minimize, ignore, or overlook." Toole, 748 A.2d at 810. We afford a high degree of deference when evaluating trial counsel's performance. See Strickland, 466 U.S. at 689. In light of this high degree of deference, we hold that Hazard has

not established that trial counsel's "failure to object or his failure to request a cautionary instruction was objectively unreasonable." See Jaiman, 55 A.3d at 238.

Furthermore, even if Hazard had somehow satisfied the first prong of Strickland, we are convinced that he has not demonstrated the existence of any prejudice suffered as a result of the prosecutor's characterization of Hazard as a liar. As previously discussed, in addition to failing to show that trial counsel's performance was deficient, this Court also must find that trial counsel's performance was "so serious as to deprive defendant of a fair trial." Strickland, 466 U.S. at 687.

In this case, we are not satisfied that the prosecutor's closing argument was incurably prejudicial or that it would have demanded a declaration of a mistrial. The trial justice carefully instructed the jury about its obligation to review only evidence that had been introduced during the trial. See State v. Hak, 963 A.2d 921, 930 (R.I. 2009) (holding that comments were not prejudicial when the trial justice instructed the jury that it alone was to weigh credibility and that statements by attorneys during closing arguments were not evidence). Specifically, before closing arguments, the trial justice explained that the attorneys "are not * * * allowed to offer their personal opinions as to the evidence and to the extent[] they do so, you must disregard any personal opinions that are stated by counsel." She also instructed that

> "to the extent that the attorneys make reference to testimony or other evidence that differs from your own recollection as to what the testimony was or the evidence was, I tell you now that it is your recollection that controls and no statement by the attorneys that may differ from your own recollection."

Further, after closing arguments, she again instructed the jury that

> "[i]t is you and you alone who have the responsibility for making credibility determinations and factual determination and of the ultimate determination as to the proper verdict in this case.

- 19 -

> "Remarks or statements or personal opinions expressed by counsel during the trial or in final argument to you, are not evidence again and are not to be considered by you as evidence during the course of your deliberations."

Based on these clear instructions, the prosecutor's comments during closing argument were not unfairly prejudicial. See State v. Fortes, 922 A.2d 143, 151 (R.I. 2007) ("[I]n light of the clear instructions given by the trial justice," the prosecutor's comment during closing argument "was not unfairly prejudicial."). Accordingly, we hold that trial counsel's failure to object did not prejudice Hazard or undermine the validity of the trial or the verdict that was reached.

### 3
### Failure to Object to Vouching

Finally, Hazard contends that trial counsel's failure to object to what he argues was improper vouching for the truthfulness of Lisa, Carla, and Arling during the state's closing argument, and his failure to request a cautionary jury instruction, constitutes ineffective assistance of counsel. The state concedes that the prosecutor's statements arguably were improper vouching, but maintains that the postconviction-relief justice properly concluded that trial counsel's failure to object to the prosecutor's remarks were not so prejudicial as to meet the second prong of Strickland.

"We have held that '[a] prosecutor is allowed considerable latitude in [closing] argument[s] * * * as long as [he or she] stays within the evidence and * * * legitimate inferences * * *.'" Jaiman, 55 A.3d at 236 (quoting State v. Werner, 851 A.2d 1093, 1107 (R.I. 2004)). "However, we also have said that '[i]t is improper for the prosecution to vouch for the credibility of a government witness,'" which can occur "if the prosecution 'place[s] the prestige of the government behind the witness * * *.'" Id. at 236-37 (quoting State v. Chakouian, 537 A.2d 409, 412 (R.I. 1988)). "It is not enough, however, for a defendant on appeal to assert that the

prosecutor assured the jury that a witness's testimony was credible." Id. at 237. "The defendant must be able to identify, as the basis for that comment, an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record." Id.

It is patently obvious that this case centered on credibility. As a result, both sides liberally attacked the veracity of the witnesses produced by the other. Indeed, during trial counsel's closing argument, he attacked the credibility of Lisa, Carla, and Arling: he made comments such as, "if you do believe [Lisa], you have to ignore a lot of facts and a lot of testimony," he pointed out inconsistencies in Carla's testimony, and he suggested that Arling was biased because he was in a relationship with Carla. In response to these attacks, the prosecutor referred to Lisa's testimony as "honest and forthright." He also made comments, such as "[w]hen she testified, did she look like she was telling the truth? I thought she did. I thought she came up very honest. She was very forthright," and he also suggested that there was no evidence that her mother told her what to say "[b]ecause the young girl is telling the truth." In reference to Arling's credibility, the prosecutor asked the jury "[h]ow credible is that? It is pretty credible." He also suggested that Carla "[wa]s telling the truth." Arguably, these comments could be construed as improper vouching and implying special knowledge on the part of the state. See Jaiman, 55 A.3d at 237 (citing examples of improper vouching).

Assuming without deciding that the prosecutor's statements about Lisa, Carla, and Arling were objectionable, it is nonetheless our opinion that trial counsel's failure to object was not constitutionally deficient or so prejudiced Hazard that it rendered the verdict in his trial unreliable. As we discussed above, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Jaiman, 55 A.3d at 238.

- 21 -

In light of that high degree of deference, we hold that Hazard has not established that trial counsel's failure to object was "objectively unreasonable." Id. Moreover, as discussed above, the trial justice instructed the jury that any statements made by counsel during closing arguments were not evidence and that opinions of counsel expressed during trial or in their closing arguments are improper and should be disregarded. Accordingly, we hold that trial counsel's failure to object did not prejudice Hazard or undermine the validity of the trial or the verdict that was reached.[12]

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

[12] Similarly, Hazard challenges the following remark by the prosecutor in his closing argument: "Did [trial counsel] ever confront [Lisa] with an inconsistent statement from all of her prior statements? I got her statements. Did he ever confront her with a prior inconsistent statement? Absolutely not." While this comment may be improper, Hazard has failed to establish any prejudice as a result of his trial counsel's failure to object. As the postconviction-relief justice observed, this remark "was brief and isolated, and came after the jury had already heard an abundance of evidence regarding [Hazard]'s guilt, including the testimony of several corroborating witnesses," and, therefore, did not prejudice Hazard or the outcome of his trial. We agree.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         Harold Hazard v. State of Rhode Island.

**CASE NO:**                   No. 2011-303-Appeal.
                                     (KM 03-799)

**COURT:**                      Supreme Court

**DATE OPINION FILED:**   May 3, 2013

**JUSTICES:**                  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**             Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

                                     Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

                                     For Applicant:  James T. McCormick, Esq.

                                     For State:  Jane M. McSoley
                                                        Department of Attorney General