January 7, 2019

**Supreme Court**

No.  2016-72-C.A.
(P2/12-1420A)

State                                  :

v.                                  :

Danielle LeFebvre.                    :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Danielle LeFebvre. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  The defendant, Danielle LeFebvre, appeals from a judgment of conviction after a jury found her guilty of first degree child abuse, in violation of G.L. 1956 § 11-9-5.3.  The trial justice sentenced the defendant to twenty years' imprisonment, with eighteen years to serve and the balance suspended, with probation.  Before this Court, the defendant argues that the trial justice erred by requiring Sheila Russell, a licensed clinical social worker, to testify about statements the defendant made to her while seeking mental-health treatment.  The defendant claims that her communications with Russell were privileged pursuant to the Confidentiality of Health Care Information Act, G.L. 1956 chapter 37.3 of title 5 (CHCIA).  A threshold, and ultimately dispositive, issue is whether any privilege arising from that statute is abrogated by G.L. 1956 § 40-11-11, which nullifies "[t]he privileged quality of communication between * * * any professional person and his or her patient or client * * * in situations involving known or suspected child abuse or neglect and [the privileged quality of communications] shall not constitute grounds for * * * failure to give or accept evidence in any judicial proceeding relating to child abuse or neglect."  After thoroughly reviewing the record, and carefully considering the arguments of the parties, we affirm the judgment of conviction.

- 1 -

# I

## Facts and Travel

In the fall of 2011, defendant lived in her mother's apartment with her infant son, James, who was born on September 3, 2011.[1] This was a difficult time for her. She and her mother, JoAnn LeFebvre, had a tense relationship; defendant was averaging only two to five hours of sleep at night, and baby James had become frustratingly fussy.[2] James's father was absent from the baby's life, and, although JoAnn would occasionally babysit, the burden of child care fell mostly on defendant. Life was stressful for defendant, and the impact of that stress appears to have affected her relationship with her son. According to JoAnn, defendant was experiencing difficulty bonding with James. JoAnn did not observe the kind of playfulness and affection that one would expect from a new mother, and she observed that defendant was "aggressive" with the baby and would sometimes yell to vent her pent-up frustrations.[3]

On October 19, 2011, defendant arrived at the emergency room of Hasbro Children's Hospital with James, then almost seven weeks old. The defendant told the attending physician that the day before, she had been sitting on the edge of her bed with James cradled against her shoulder, trying to lull him to sleep for a quick nap, when she herself fell asleep. She testified that she woke up sometime later to find James crying on the floor by the bed, where he had fallen while she slept. As she was consoling him, defendant claimed, she noticed that his head was red, but she did not feel anything out of the ordinary when she checked the back of his head, and he

---

[1] We have assigned a pseudonym to the child to protect his privacy.
[2] According to defendant, she voluntarily terminated her parental rights to James before her criminal trial.
[3] The record reveals that defendant also had a seven-year-old child at the time of James's birth. That child did not reside with defendant.

calmed down to take a bottle.  The defendant then brought James to her grandmother's home for an overnight visit.

The next morning, defendant returned to work for the first time since she had gone on maternity leave.  While she was at work, she received two phone calls from her grandmother, who had noticed that James was not acting normally.  The defendant left work an hour early to check on James, and she knew something was wrong as soon as she saw him.  After returning to her apartment to pack a diaper bag, she brought James to the emergency room.  The defendant told the attending physician that her grandmother had reported that James appeared listless, was not eating, had rapid eye movements, and that his limbs were twitching.  A head CT scan and a skeletal survey of James's body revealed a fractured skull, bleeding in and around his brain, and two fractured ribs, which, based on how much they had healed, may have occurred as late as the very afternoon James was admitted to the hospital.  Hospital staff, concerned that James's injuries might be the result of abuse, referred James's case to the Department of Children, Youth, and Families (DCYF).  The defendant was later charged by criminal information with one count of first degree child abuse, in violation of § 11-9-5.3(b)(1).

The attending physician later testified that she did not believe that any of the baby's injuries were consistent with the type of short fall that had been described by defendant.  To the contrary, the attending physician testified that James's rib fractures could not have been caused by a fall from a bed, but rather were more consistent with someone squeezing or compressing the infant's chest.  The doctor further opined that James's head injuries were consistent with abusive head trauma, also known as "Shaken Baby Syndrome."[4]

---

[4] The defendant told an interrogating police officer that it was possible that she had injured her son, because she "know[s] that [she] get[s] upset" and that she was "rougher than [she] should be."

Before trial, defendant's counsel, in connection with plea negotiations, provided the state with medical records from mental health treatment that defendant had sought at Butler Hospital in the days following James's injuries. Included in those records were the intake notes of Sheila Russell, a licensed clinical social worker who had conducted an initial psychiatric evaluation of defendant. That evaluation said, in pertinent part, that "[defendant] doesn[']t remember what she did or on h[o]w many occasions, but has enough 'fuzzy recollection' to know she did indeed cause the harm. [R]emembers feeling 'enraged' at the baby and 'throwing him on the bed just to get away from him.'" After the trial justice granted the state's motion *in limine* to use those records against defendant at trial, the state served a subpoena *duces tecum* on Butler Hospital to produce copies of Russell's records and to require her testimony. Over the hospital's strenuous objection, the trial justice denied Butler's motion to quash the subpoena, and she also required Russell to testify about her notes during the state's rebuttal case.[5]

Before this Court, defendant argues that the trial justice erred when she required Sheila Russell to testify about disclosures defendant made to her during the intake interview, because, defendant contends, her conversation with Russell was privileged as a "confidential health care communication[]" under § 5-37.3-6. The defendant further argues that § 40-11-11 abrogates that privilege only in certain Family Court proceedings but does not do so in criminal cases.

## II

### Standard of Review

"[W]e review questions of statutory interpretation *de novo*." *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013) (quoting *Campbell v. State*, 56 A.3d 448, 454 (R.I. 2012)). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by

---

[5] The defendant testified in her own defense. In the course of that testimony, she denied ever intentionally shaking or throwing James.

the Legislature." *Id.* (quoting *Alessi v. Bowen Court Condominium*, 44 A.3d 736, 740 (R.I. 2012)). "[W]hen [the] statute expresses a clear and unambiguous meaning, the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute." *State v. Marsich*, 10 A.3d 435, 440 (R.I. 2010) (quoting *State v. Smith*, 766 A.2d 913, 924 (R.I. 2001)). "[T]he Legislature is presumed to have intended each word or provision of a statute to express a significant meaning, and the [C]ourt will give effect to every word, clause, or sentence, whenever possible." *State v. Clark*, 974 A.2d 558, 571 (R.I. 2009) (quoting *State v. Bryant*, 670 A.2d 776, 779 (R.I. 1996)).

### III

### Discussion

This appeal pivots on a single issue: whether defendant's discussion with Russell, a licensed clinical social worker, was a privileged health care communication pursuant to § 5-37.3-6 of CHCIA, or whether the privilege is rendered a nullity by § 40-11-11.

### A

### Waiver

During the hearing on the state's motion *in limine*, the state argued, as it does before this Court, that § 40-11-11 abrogates any privilege under CHCIA. The defendant's counsel admitted, with laudable candor, that she had been unaware of the existence of § 40-11-11 prior to receiving notice of the state's motion *in limine* two days before the hearing. After hearing argument from both sides, the trial justice ruled that § 40-11-11 did away with any potential privilege under

CHCIA that may have attached to any disclosures defendant made to Russell during her psychiatric evaluation.[6]  In response to the trial justice's ruling, defendant's counsel stated:

> "It was a very straightforward statute, I agree with that, Judge, and I defer to the [c]ourt on this matter.  * * *.
> "So I defer to the Court on the decision here, but I would like to state that without having, I'd say, a week to look into this, to look into other jurisdictions, I can't say that I have a strong argument to make either way at this point."

As a result of this representation before the trial court, the state argues on appeal that the claim of privilege was waived.

However, despite her seeming acquiescence to the trial justice's ruling, defendant's counsel later challenged the state's proffer of Russell's testimony before it was offered to the jury.  She maintained that the communication was privileged under CHCIA.  Addressing the potential abrogation of defendant's CHCIA privilege, counsel stated:

> "I would like to put on the record that, again, I have not been able to fully explain to my client exactly all of her options because, again, I do not feel I had enough time or been [*sic*] able to put the effort into this untried, and if you will, novel idea of bringing in records which I in fact turned over, from my understanding, [during] plea negotiations to the State.
>
> "So I would just like there be [*sic*] a continuing objection.  * * *."

The trial justice granted the request for a continuing objection to Russell's testimony.

In our opinion, for the purposes of this appeal, the defendant's request for, and the trial justice's grant of, a continuing objection sufficiently preserved this argument for review by this Court.

### B

### The First Sentence of § 40-11-11

---

[6] The state's motion *in limine* mistakenly named Melissa Ludwig, M.D., as the therapist who had conducted defendant's initial psychiatric evaluation at Butler Hospital.

Under CHCIA, "confidential health care communications" are not "subject to compulsory legal process in any type of judicial proceeding[.]" Section 5-37.3-6(a). The act defines "[c]onfidential health care communication" as "a communication of health care information by an individual to a health care provider * * * not intended to be disclosed to third persons[.]"[7] Section 5-37.3-3(3)(i).

The defendant argues that Russell was a "health care provider" under the statute, that any statements she made during her intake evaluation with Russell were made for the purpose of obtaining mental health treatment, and that those statements were not intended to be disclosed to any third persons. Therefore, she argues, the statements were privileged and consequently should not have been admitted into evidence.

However, this appeal does not turn on whether defendant's discussion with Russell was privileged. This is so because, even though the requirements of CHCIA may have been met, any privilege that she might otherwise have enjoyed was rendered a nullity by the clear and unambiguous language of § 40-11-11. That statute provides, in pertinent part:

---

[7] We have considered the constitutionality of this statute on multiple occasions. *See State v. Almonte*, 644 A.2d 295, 297-99 (R.I. 1994); *Bartlett v. Danti*, 503 A.2d 515, 517 (R.I. 1986). In those cases, we declared the privilege enacted in G.L. 1956 § 5-37.3-6 to be unconstitutional because the statute, as written, gave "uncontrolled discretion over how the litigants and the trial courts of the state adjudicate disputes to the patient 'who can decide with impunity whether to permit access to such information.'" *Almonte*, 644 A.2d at 297 (quoting *Bartlett*, 503 A.2d at 517). In *Almonte*, we said that § 5-37.3-6 "substantially makes unavailable to the judicial process any health care information whether arising out of a confidential communication, or objective tests or observations. This is an intrusion upon the judicial power of the state which cannot be countenanced." *Id.* at 299. After our decision in *Almonte*, the General Assembly enacted § 5-37.3-6.1, which provides a mechanism for trial courts to admit confidential health care information in certain circumstances. *See* P.L. 2006, ch. 248, § 3; P.L. 2006, ch. 266, § 3. We have since held that this latter enactment "adequately addresses the heretofore recognized constitutional infirmities and strikes a permissible balance between a party's interest in maintaining the confidentiality of his or her personal health care records and the court's need to access relevant information." *In re Doe*, 717 A.2d 1129, 1133 (R.I. 1998).

> "The privileged quality of communication between husband and wife and any professional person and his or her patient or client, except that between attorney and client, is hereby abrogated in situations involving known or suspected child abuse or neglect and shall not constitute grounds for * * * failure to give or accept evidence in any judicial proceeding relating to child abuse or neglect. In any family court proceeding relating to child abuse or neglect * * * no privilege of confidentiality may be invoked with respect to any illness, trauma, incompetency, addiction to drugs, or alcoholism of any parent." Section 40-11-11.

The defendant first agrees with the state that § 40-11-11 is unambiguous, but argues that any abrogation of privacy applies only in certain Family Court proceedings. She posits that the phrase "proceeding relating to child abuse or neglect," used in the first sentence of the statute, is a "term of art" that refers only to DCYF-initiated proceedings that are heard on a specialized calendar in the Family Court, which defendant refers to as the "abuse and neglect calendar." The defendant offers no support for this bald assertion, stating only that "proceeding relating to child abuse or neglect" is a "shorthand phrase" that parties and judges use to refer to that specialized calendar and the cases that appear on it.

Accepting, *arguendo*, that the phrase "proceeding relating to child abuse or neglect" has in fact entered the lexicon of breviloquent colloquialisms favored by legal professionals familiar with Family Court practice, we nonetheless conclude that the General Assembly would not have employed the phrase in a colloquial fashion when enacting the legislation. The plain meaning of the phrase "any judicial proceeding relating to child abuse or neglect" is indeed unambiguous, and it encompasses the full spectrum of matters that relate to the abuse or neglect of a child. Had the General Assembly intended to limit the application of § 40-11-11 to the narrow class of cases

- 8 -

suggested by defendant, it surely would have done so explicitly, rather than employing what defendant refers to as a "shorthand phrase."[8]

At best, defendant may have demonstrated that "any judicial proceeding relating to child abuse or neglect" has a specialized meaning in the context of the Family Court. It is true that "[a] word [or phrase] may acquire a specific meaning and become a word of art through constant and unmistakable usage." *State v. Domanski*, 57 R.I. 500, 501, 190 A. 854, 856 (1937). However, if a word or phrase "has no technical or precise definition" and "does not in all cases convey a single identical meaning[,]" but rather has a "variety of meanings" based on the context of its usage, then that word or phrase is not a term of art. *Douglas v. Pratt*, 102 R.I. 445, 448, 231 A.2d 486, 488 (1967).

When the language of a statute is unambiguous, we must enforce the words of the statute as they are written according to "their plain and ordinary meaning." *Harvard Pilgrim Health Care of New England, Inc. v. Gelati*, 865 A.2d 1028, 1037 (R.I. 2004). As the trial justice held below, § 40-11-11 unambiguously abrogates all privileges that might otherwise attach to communications "between husband and wife and any professional person and his or her patient or client, except that between attorney and client * * * in situations involving known or suspected child abuse or neglect" and any such privileges cannot justify a "failure to give or accept evidence in any judicial proceeding relating to child abuse or neglect." The language employed by the General Assembly could not be more clear.

**C**

---

[8] We also note that, when the General Assembly enacted G.L. 1956 § 11-9-5.3, known as Brendan's Law, it vested the Family Court with exclusive jurisdiction over the offense. *State v. Sivo*, 925 A.2d 901, 916 (R.I. 2007). However, on July 3, 2006, the General Assembly enacted two public laws that removed jurisdiction of child abuse offenses from the Family Court to the Superior Court. *See State v. Jennings*, 944 A.2d 171, 173 (R.I. 2008); *see also* P.L. 2006, ch. 260, § 1; P.L. 2006, ch. 290, § 1.

## The Second Sentence of § 40-11-11

The defendant argues in the alternative that the wording of the first sentence, if clear on its face, is rendered ambiguous by the inclusion of the phrase "any *family court* proceeding relating to child abuse or neglect" that is found in the second sentence. Section 40-11-11 (emphasis added). The defendant contends that the limitation in the second sentence to "family court proceeding" can plausibly be read as restricting the scope of the first sentence. We do not agree. The defendant's argument presumes that the two sentences of § 40-11-11 overlap one another. The interpretation that defendant urges upon us would not only contravene our firmly held principle that the "Legislature is presumed to have intended each word or provision of a statute to express a significant meaning," but would also ignore the clearly separate substance of the two sentences. *Clark*, 974 A.2d at 571. The first sentence of the statute abrogates all privileges, regardless of subject matter, that are based on the identity of the communicants, namely those "between husband and wife and any professional person and his or her patient or client, except that between attorney and client[.]" Section 40-11-11. By contrast, the second sentence, in Family Court proceedings only, prevents the invocation of any privilege of confidentiality only with respect to certain subject matter, namely "any illness, trauma, incompetency, addiction to drugs, or alcoholism of any parent." *Id.* Our interpretation of § 40-11-11 is further bolstered by the fact that the General Assembly thought it necessary to add the second sentence when it amended § 40-11-11 in 1988. *See* P.L. 1988, ch. 106, § 1.[9]

Based on the plain meaning of the words of this statute, the second sentence of § 40-11-11 limits the ability to invoke privileges with respect to certain subject matter in Family Court

---

[9] We also observe that, when the General Assembly chose to limit the second sentence of G.L. 1956 § 40-11-11 to "any family court proceeding," it did so explicitly rather than employ the ostensible "shorthand" that defendant suggests was used in the first sentence.

only.  On the other hand, the first sentence, in sweeping language, does away with virtually all privileges in any and all judicial proceedings that involve the abuse or neglect of a child.  This would include criminal proceedings.

We pause briefly, however, to add our concerns to those expressed by the trial justice that, especially in criminal cases, our ruling today could have a chilling effect on the benefits of psychotherapy as a rehabilitative tool in instances of child abuse and neglect.  Nonetheless, whatever our reservations might be, we are constrained to give effect to the enactments of the General Assembly.  "How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems."  *State v. Oliveira*, 882 A.2d 1097, 1117 (R.I. 2005) (quoting *Tigner v. Texas*, 310 U.S. 141, 148 (1940)).  It is not for this Court to determine whether a statute enacted by the General Assembly "comports with our [own] ideas of justice, expediency or sound public policy."  *State v. DiStefano*, 764 A.2d 1156, 1160 (R.I. 2000) (quoting *Kastal v. Hickory House, Inc.*, 95 R.I. 366, 369, 187 A.2d 262, 265 (1963)).  Where the General Assembly has lawfully enacted a statute whose terms are clear and unambiguous, "the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute."  *Marsich*, 10 A.3d at 440.

## IV

## Conclusion

For the foregoing reasons, the judgment of conviction is affirmed, and the record shall be returned to the Superior Court.

- 11 -

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Danielle LeFebvre. |
| **Case Number** | No. 2016-72-C.A.<br>(P2/12-1420A) |
| **Date Opinion Filed** | January 7, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General<br>For Defendant:<br><br>Angela M. Yingling<br>Office of the Public Defender |