May 21, 2024

Danielle LeFebvre              :

v.              :

State of Rhode Island.              :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:   opinionanalyst@courts.ri.gov,   of   any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

Danielle LeFebvre                    :

v.                    :

State of Rhode Island.                    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court pursuant to a writ of certiorari, seeking review of a Superior Court decision that denied an application for postconviction relief filed by the applicant, Danielle LeFebvre (LeFebvre).  LeFebvre filed her application for postconviction relief on the grounds that she was deprived of the effective assistance of counsel and, thus, she should have been afforded a new trial.  LeFebvre faults her trial counsel (defense counsel) for failing to consult, and present at trial, an expert in the medically complicated child abuse prosecution and for purposefully disclosing harmful information that was damaging to her case.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

## Facts and Travel

The facts from LeFebvre's jury trial are detailed in *State v. LeFebvre*, 198 A.3d 521 (R.I. 2019) (*LeFebvre I*). We set forth below the relevant facts.

On October 18, 2011, LeFebvre brought her almost seven-week-old infant son[1] to her grandmother's home for an overnight visit. *LeFebvre I*, 198 A.3d at 523. The next morning, on October 19, 2011, LeFebvre returned to work from maternity leave. *Id.* While LeFebvre was at work, her grandmother "noticed that James was not acting normally." *Id.* LeFebvre's grandmother made two telephone calls to LeFebvre to communicate her concerns regarding James's unusual behavior; however, rather than immediately leaving to check on her son, LeFebvre remained at work, and left an hour early. *Id.* Upon arriving at her grandmother's home, LeFebvre observed her son's behavior and realized he needed medical attention. *Id.* Rather than immediately proceeding to Hasbro Children's Hospital (Hasbro), LeFebvre returned to her apartment, packed a few items, and then drove to Hasbro's emergency room. *Id.*

When LeFebvre and James arrived at the emergency room, medical staff performed several tests including a head CT and a skeletal survey of the infant's

---

[1] Throughout this opinion, we refrain from referring to LeFebvre's infant son by his legal name in order to preserve the infant's privacy. As this Court observed in *State v. LeFebvre*, 198 A.3d 521 (R.I. 2019) (*LeFebvre I*), we refer to the infant as "James." *See LeFebvre I*, 198 A.3d at 522 n.1. We intend no disrespect.

body—which Dr. Amy Goldberg explained were "x-rays of two views" and included a "front and a side view of every bone in the body." These tests revealed that James had suffered life-threatening injuries, which caused serious permanent damage. These injuries included complex skull fractures, subdural and subarachnoid hemorrhages, and brain contusions. James was admitted to Hasbro, where he remained inpatient for several days. On November 3, 2011, James's x-rays revealed that he suffered rib fractures that were consistent with having sustained the injury on or around the time of his admission at Hasbro (October 19, 2011)—the day after LeFebvre recalled her son having accidentally fallen off the bed.

While Hasbro was conducting multiple medical tests on the child, LeFebvre revealed to the attending physician that, "the day before [i.e., October 18, 2011], she had been sitting on the edge of her bed with James * * * trying to lull him to sleep for a quick nap, when she herself fell asleep." *LeFebvre I*, 198 A.3d at 522. LeFebvre explained that when she woke up, she found James crying on the floor by the bed. *Id.* LeFebvre also told the attending physician about her grandmother's observations that "James appeared listless, was not eating, had rapid eye movements, and that his limbs were twitching." *Id.* at 523. Based on James's extensive injuries, Hasbro notified the Department of Children, Youth, and Families (DCYF). *Id.*

On May 10, 2012, LeFebvre was charged by way of criminal information with one count of first-degree child abuse, in violation of G.L. 1956 § 11-9-5.3(b)(1). *See LeFebvre I*, 198 A.3d at 523. Defense counsel and the state entered into plea negotiations, and as part of the parties' discussions, defense counsel provided the state with LeFebvre's medical records (medical records) from Butler Hospital, regarding her mental health treatment. *Id.* Defense counsel offered this material to the prosecution as part of LeFebvre's mitigation package in hopes that it would convince the state to reduce the charge brought against her. Nonetheless, as noted by the trial justice, "[t]he prosecutor had not provided [defense] counsel with any assurances or promises that she would amend the charge if she received mitigation material." The prosecutor subsequently reviewed the medical records but did not amend the charge; by that point, the state had already made its best offer at pretrial—the mandatory minimum sentence for first-degree child abuse. LeFebvre rejected this offer.[2] After LeFebvre rejected the plea offer, trial ensued.

---

[2] In her decision, the trial justice noted that "[defense] counsel had good reason to hope for an amendment to the charge" because "the evidence against * * * Le[F]ebvre overwhelmingly supported the [s]tate's claim that she committed first-degree child abuse on her infant son." The trial justice further noted that the state did not make any assurances or promises that the charged offense would be amended if defense counsel provided the medical records as part of the mitigation materials; however, the trial justice also recounted that she cautioned the state's prosecutor that "just because she could use the records doesn't mean she should use them." The state agreed to refrain from using the medical record evidence in its

- 4 -

At trial, LeFebvre testified to her version of the events that transpired on October 18, 2011; specifically, that James fell off the bed and onto the floor when she dozed off. *LeFebvre I*, 198 A.3d at 523. The trial justice—who also presided over LeFebvre's application for postconviction relief—later found in her written decision on the application that in light of several witnesses' trial testimony and LeFebvre's testimony,[3] she deemed LeFebvre to be "not credible, and the [c]ourt and likely the jury discounted [LeFebvre's testimony] and rejected her claim that the baby suffered his * * * injuries in an accidental short-fall from her bed."

On March 24, 2015, LeFebvre was convicted of first-degree child abuse as a result of the permanent injuries to her seven-week-old infant son. LeFebvre filed a motion for a new trial, which the Superior Court denied. The trial justice subsequently sentenced LeFebvre to twenty years at the Adult Correctional Institutions, with eighteen years to serve, and the balance suspended, with probation. LeFebvre appealed from the judgment of conviction, which we affirmed. *See LeFebvre I*, 198 A.3d at 528.

---

case-in-chief but made clear to the defense counsel that the state reserved the right to use the medical records in rebuttal if LeFebvre testified in a manner inconsistent with the records.

[3] We note that LeFebvre did not testify at the postconviction-relief hearing. We also note that LeFebvre is represented by different counsel in this appeal from the postconviction-relief hearing and trial.

Subsequently, LeFebvre filed an application seeking postconviction relief. After considering the parties' memoranda and testimony at the postconviction-relief hearing, the trial justice issued a written decision denying LeFebvre's application. The trial justice noted LeFebvre first contended that "[defense] counsel provided ineffective assistance of counsel by going to trial without *presenting* an expert witness and without *consulting* with [an expert] before cross-examining Dr. Goldberg * * *." (Emphases added.) Second, the trial justice noted that LeFebvre argued in her application that defense counsel "voluntarily produc[ed] mental health records to the prosecution, incorrectly believing them to be inadmissible at trial."

During the postconviction-relief hearing, the trial justice had the opportunity to evaluate the testimony of an expert, Dr. Joseph Scheller (Dr. Scheller). In her decision, the trial justice noted that "[i]n an effort to provide * * * Le[F]ebvre with a broad and complete opportunity to pursue her post-conviction relief application, the [c]ourt provided requested funds to her post-conviction relief attorney to engage the services of an expert." Accordingly, "the [c]ourt analyze[d] the proffered testimony of Dr. Scheller and decide[d] [LeFebvre's] petition *as though* [defense] counsel had obtained funds and *had consulted with and presented* an expert such as Dr. Scheller at trial." (Emphases added.) The court evaluated "whether [Dr. Scheller's] opinions would be admissible at trial as legally sufficient, having evidentiary reliability, scientific validity and relevance." In the event that Dr.

- 6 -

Scheller's expert opinion was deemed to be admissible, the court would then proceed to determine "whether [Dr. Scheller's] credibility was so poor that no reasonable jury would have accepted his opinions and that failure to present him at trial failed to meet the prejudice prong * * *." The trial justice determined that Dr. Scheller failed in both respects.

Mindful of the proper standard for the use of medical expert opinions, the trial justice noted several concerns with Dr. Scheller's proffered opinion. For example, the trial justice observed that "it [was] unclear whether [Dr. Scheller's] testimony would have survived a *Daubert* challenge."[4] Doctor Scheller, although Board Certified in pediatrics and pediatric neurology, did not hold certifications in child abuse pediatrics, radiology, or neuroradiology. The trial justice also found Dr. Scheller's testimony to be concerning when he stated that he did not believe that a person "without a history of a serious psychological problem or a serious behavior problem * * * would violently shake a child just simply out of frustration * * *." The court later engaged in the following colloquy to clarify its concerns:

---

[4] "In *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677, 686 (R.I. 1999), this Court discussed the standard for admitting expert scientific testimony that should govern the trial court's decision about whether to allow the jury to hear this type of evidence." *Owens v. Silvia*, 838 A.2d 881, 890 (R.I. 2003). Although this Court "declined to expressly adopt the standards outlined in the United States Supreme Court decision of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we drew guidance from the principles of that case." *Id.*

"THE COURT: Is it your testimony, just so I understand it, that you haven't seen a confession yet in one of those cases that you found to be reliable?

"[DOCTOR SCHELLER]: I use the word 'credible.' * * * I have not found one that's credible."

Significantly, the trial justice also observed that Dr. Scheller "spoke not only in terms of possibilities, but * * * rare possibilities. He never quantified his opinion that it was possible for the injuries to have been sustained in an accidental short-fall." For example, Dr. Scheller testified that "*it is possible* that [James's] injuries documented at the end of October, 2011, did happen from a short fall even though they are very dramatic and very serious." (Emphasis added.) The court interjected and reminded counsel that the "case law is exceptionally clear that 'possible' is not a basis for an expert opinion * * *."

Thus, the trial justice determined that Dr. Scheller's testimony "failed to provide a scientifically valid and reliable opinion to challenge the strength of Dr. Goldberg's contention that the infant did not sustain his multiple injuries from an accidental short-fall." Without sufficiently reliable and credible testimony from Dr. Scheller, the trial justice concluded that the absence of this testimony did not rise to a level that deprived LeFebvre of effective assistance of counsel. Accordingly, with respect to LeFebvre's contentions that defense counsel failed to consult and present an expert at trial—the trial justice concluded that, LeFebvre failed to meet her burden

under the seminal case, *Strickland v. Washington*, 466 U.S. 668 (1984), which will be discussed *infra*.

In further support of her contention that defense counsel's failure to consult an expert constituted ineffective assistance of counsel, LeFebvre argued that defense counsel's cross-examination of Dr. Goldberg was ineffective and deprived her of a fair trial. At the postconviction-relief hearing, defense counsel testified, and admitted, that she did not believe that she had the medical knowledge or understanding to properly cross-examine Dr. Goldberg. However, defense counsel also testified that she extensively researched the subject in preparation for trial. In addition to her independent research, defense counsel further testified that she received some assistance from "an acquaintance who was a nurse," and that she believed she "paid her very minimally just to give me the basics of what was in the [medical] records."

Noting her observations from trial, the trial justice stated that defense counsel "questioned [Dr. Goldberg] in detail about the infant's injuries[,]" and that defense counsel particularly inquired about James's brain contusions, rib fractures, the aging and timing of the rib fractures, and the mechanisms that could have caused his injuries. Based on the court's observations from the postconviction-relief hearing, and in referencing defense counsel's efforts from trial, the trial justice concluded that defense counsel "made every effort to familiarize herself with [James's]

condition[,]" and that defense counsel "was well-prepared and that her cross-examination was adequate." Accordingly, the trial justice determined that LeFebvre failed to satisfy the *Strickland* test with respect to both issues—defense counsel's alleged failure to consult, and ultimately, present an expert to effectively cross-examine the state's expert at trial; and voluntarily disclosing the medical records to the state that contained inculpatory statements made by LeFebvre—and, thus, LeFebvre failed to meet her burden showing that she was deprived of her Sixth Amendment right to effective assistance of counsel.

As such, the trial justice found no *Strickland* violation and denied the application for postconviction relief. The trial justice issued a written decision on February 24, 2020, and judgment entered on June 8, 2020. LeFebvre subsequently filed a petition for a writ of certiorari, which we granted.

**Standard of Review**

"A party aggrieved by a final judgment entered in response to a postconviction-relief application may seek review 'by filing a petition for writ of certiorari.'" *Atryzek v. State*, 268 A.3d 37, 41 (R.I. 2022) (deletion omitted) (quoting G.L. 1956 § 10-9.1-9). "Our review of a case on certiorari is limited to an examination of the record to determine if an error of law has been committed." *Id.* (quoting *State v. Poulin*, 66 A.3d 419, 423 (R.I. 2013)). "In addition to examining the record for judicial error, we inspect the record to discern if there is any legally

- 10 -

competent evidence to support the findings of the hearing justice below." *Id.* (quoting *Poulin*, 66 A.3d at 423). "This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Id.* (quoting *Chapdelaine v. State*, 32 A.3d 937, 941 (R.I. 2011)).

## Analysis

On appeal, LeFebvre argues that the trial justice erred in denying her application for postconviction relief because the trial justice incorrectly concluded that LeFebvre failed to meet the two-prong test adopted by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), to establish ineffective assistance of counsel. For "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction[,]" the *Strickland* Court set forth the following test:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

- 11 -

This Court has adopted the *Strickland* test. *Whitaker v. State*, 199 A.3d 1021, 1027 (R.I. 2019) ("When examining claims of ineffective assistance of counsel, it is well settled that we will adhere to the requirements set forth in *Strickland v. Washington*."). "The benchmark issue is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (brackets omitted) (quoting *Barros v. State*, 180 A.3d 823, 828 (R.I. 2018)). "In evaluating counsel's performance, we keep in mind that there is 'a strong presumption * * * that an attorney's performance falls within the range of reasonable professional assistance and sound strategy.'" *Id.* (brackets omitted) (quoting *Navarro v. State*, 187 A.3d 317, 326 (R.I. 2018)); *see also State v. Andrade*, 209 A.3d 1185, 1192 (R.I. 2019) ("[T]he right to counsel is the right to the effective assistance of counsel.") (quoting *Strickland*, 466 U.S. at 686).

Here, LeFebvre alleges two separate instances of ineffective assistance of counsel, which she contends warrants a new trial. First, she contends that defense counsel's failure to consult and present an expert witness at trial resulted in a defense that fell below the objective standard of reasonableness. For example, LeFebvre submits that defense counsel was "woefully underprepared" and that defense counsel "acknowledged that she was in over her head." Second, LeFebvre asserts that under the first prong of the *Strickland* test, defense counsel's disclosure of LeFebvre's medical records to the state's prosecutor "cannot be dismissed as a reasonable

strategic choice." As a result of defense counsel's disclosure of the medical records to the state, albeit ignorant of G.L. 1956 § 40-11-11,[5] LeFebvre asserts that the legal representation she received fell below the objective standard of reasonableness set forth in *Strickland's* first prong.

LeFebvre maintains that the second prong under *Strickland* (the prejudice prong) is also met, specifically, that "there was a reasonable probability that, absent [defense counsel's] deficient performance, the outcome of the trial would have been different." *See Strickland*, 466 U.S. at 694. We first address LeFebvre's argument with respect to defense counsel's decision to produce the medical records to the prosecution.

---

[5] General Laws 1956 § 40-11-11, "Abrogation of privileged communications," states:

> "The privileged quality of communication between husband and wife and any professional person and his or her patient or client, except that between attorney and client, is hereby abrogated in situations involving known or suspected child abuse or neglect and shall not constitute grounds for failure to report as required by this chapter; failure to cooperate with the department in its activities pursuant to this chapter; or failure to give or accept evidence in any judicial proceeding relating to child abuse or neglect. In any family court proceeding relating to child abuse or neglect, notwithstanding the provisions of chapter 37.3 of title 5, or the provisions of § 9-17-24, no privilege of confidentiality may be invoked with respect to any illness, trauma, incompetency, addiction to drugs, or alcoholism of any parent."

- 13 -

**Disclosure of LeFebvre's Medical Records**

***Strickland's* Objective Standard of Reasonableness Prong**

This Court has stated that it "will not meticulously scrutinize an attorney's reasoned judgment or strategic maneuver in the context of a claim of ineffective assistance of counsel." *Rice v. State*, 38 A.3d 9, 17 (R.I. 2012) (quoting *Brennan v. Vose*, 764 A.2d 168, 173 (R.I. 2001)).

LeFebvre contends on appeal that "[defense] counsel's decision to disclose * * * [the medical] records to the prosecutor cannot be dismissed as a reasonable strategic choice." Specifically, the trial justice found that the "pretrial statements were so damaging, and [LeFebvre's] version of how the injuries were sustained was so lacking in credibility" that "the production of [the medical] records did not alter the outcome of the case." Accordingly, the trial justice determined that defense counsel's "decision to produce those records was a tactical one * * *. It was strategic because the evidence against [LeFebvre] was overwhelming." As such, the trial justice concluded that because the decision to produce the medical records was tactical, LeFebvre could not satisfy *Strickland's* first prong that defense counsel's representation was "objectively unreasonable." *See Rice*, 38 A.3d at 18. We disagree.

Although this Court affords deference to the trial justice's finding that defense counsel's production of the medical records was a tactical decision, we are

unpersuaded by her reasoning. It is our conclusion that in the context of this case, the uninformed disclosure to the prosecution of her client's medical records was "objectively unreasonable," and LeFebvre has satisfied the first prong under *Strickland*.

In *Rice*, this Court was confronted with a similar situation where trial counsel "testified that he communicated with Rice prior to and during the trial as to the strategic components of his defense, particularly in regard to the decision to not call * * * a potential medical expert." *Rice*, 38 A.3d at 17. Rice's trial counsel decided not to use the potential medical expert because "the physician essentially agreed with the state's witness * * * and that, ultimately, a pretrial evidentiary ruling in favor of the defense negated the need for such a medical opinion." *Id.* Accordingly, we held in *Rice* that "in light of trial counsel's strategic reasoning for not procuring a medical expert, and Rice being apprised of such, [this Court] consider[ed] that decision to be tactical in nature and *not* objectively *unreasonable*." *Id.* at 17-18 (emphases added).

At LeFebvre's postconviction-relief hearing, defense counsel testified that early in her representation of LeFebvre, she learned that LeFebvre had been previously admitted to Butler Hospital for mental health treatment; and defense counsel obtained those medical records.

Upon reviewing some of the medical records, defense counsel learned that the documents contained statements attributable to LeFebvre, which were potentially

inculpatory. For instance, one record contained a statement stating that "[LeFebvre] doesn[']t remember what she did or h[o]w many occasions, but has enough 'fuzzy recollection' to know she did indeed cause the harm[,] remembers feeling 'enraged' at the baby, 'throwing him on the bed just to get away from him.'" At the postconviction-relief hearing, defense counsel further testified that the state became aware of the medical records because, as part of the then-ongoing plea negotiations, she intentionally "turned them over as mitigation evidence hoping to get a reduced or amended charge."

In a pretrial motion, the state advised the court, in the presence of LeFebvre, that the prosecution would potentially offer the medical records pursuant to Rule 801(d)(2)(A) of the Rhode Island Rules of Evidence, as a statement of the party opponent. The state further argued that pursuant to § 40-11-11, the privilege that protects information given to a health care provider is abrogated in situations involving known or suspected child abuse or neglect. The trial justice determined that § 40-11-11 was clear and unambiguous. Consequently, the trial justice allowed the state to use the information within the medical records for its prosecution. We pause to note that the trial justice cautioned the state's prosecutor "that just because [she could] use [the records] doesn't mean she should" use them. The prosecution agreed not to use this evidence in its case-in-chief, but warned LeFebvre that it reserved the right to use the evidence for impeachment purposes. As the trial justice

- 16 -

noted, "[t]hat is exactly what happened." To its credit, the state waited until its rebuttal case to use this evidence.

Importantly, during her testimony, defense counsel admitted that because she failed to appreciate and understand the implications of § 40-11-11, when she provided the medical records to the state, she did not know the records would be admissible at trial "in [any] way, shape, or form." Nonetheless, defense counsel proceeded to disclose medical records containing prejudicial and inculpatory evidence of suspected child abuse that were not privileged and could be used by the state in ignorance of the law. In her decision, the trial justice observed that defense counsel "hoped to demonstrate that * * * Le[F]ebvre was remorseful and was seeking and obtaining psychiatric treatment to address mental health issues that purportedly led to the alleged conduct in question." The trial justice further found that based on the evidence, it was "clear that [defense] counsel produced the records in an effort to provide the [s]tate with mitigating information to prompt the prosecutor to amend the charge to second-degree child abuse and recommend a lesser sentence." Thus, the trial justice concluded, the disclosure was strategic in nature because "[c]ounsel sought to demonstrate remorse by producing those records to prompt the [s]tate to amend the charge."

Although we held in *Rice* that the "tactical" decision in that case was "not objectively *unreasonable*," this Court based its conclusion on the totality of the

circumstances. *Rice*, 38 A.3d at 18 (emphasis added). In *Rice*, we considered two factors. *Id.* First, the potential expert for the defense agreed with the state's witness, which led to an evidentiary ruling that ultimately negated the need for that medical opinion. *Id.* at 17. Second, the fact that the defendant in *Rice* was continuously apprised of the situation by his defense attorney was notable. *Id.* at 17-18. This Court noted that "a choice between trial tactics, which appears unwise only in hindsight, does not constitute constitutionally deficient representation under [the *Strickland*] standard." *Id.* at 18 (quoting *State v. D'Alo*, 477 A.2d 89, 92 (R.I. 1984)).

Here, we are presented with vastly different circumstances than those in *Rice*. We are of the opinion that defense counsel's decision to disclose the medical records, while unaware that privileged communications were abrogated under § 40-11-11, can only be described as unwise and ill-informed at the outset, and not in hindsight. *Rice*, 38 A.3d at 18. Although we appreciate defense counsel's thought process and valiant efforts to pursue a plea deal in the face of these facts, defense counsel made a tactical decision that was not informed and resulted in disclosing incriminating medical records to the state.

Having proceeded without an understanding of the applicable law and its potential consequences, we are of the opinion that defense counsel's disclosure of LeFebvre's medical records amounted to "objectively unreasonable" conduct. *Rice*, 38 A.3d at 18. We further conclude that defense counsel's uninformed decision does

not afford her the benefit of *Rice's* "hindsight" consideration. *Id.* ("[A] choice between trial tactics, which appears unwise only in hindsight, does not constitute constitutionally deficient representation * * *.") (quoting *D'Alo*, 477 A.2d at 92). Because defense counsel's decision was tactical but uninformed, the decision to disclose LeFebvre's inculpatory statements *was*, in fact, "objectively unreasonable," and satisfies the first prong under the *Strickland* test. *See Strickland*, 466 U.S. at 691. We now turn to whether LeFebvre has met *Strickland's* second prong.

### *Strickland's* Prejudice Prong

This Court has noted that "[u]nder the second prong of *Strickland*, * * * the applicant bears the burden of proving that prejudice resulted from deficient performance." *Hazard v. State*, 64 A.3d 749, 757 (R.I. 2013). To meet this burden, the applicant "must show that 'there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different.'" *Whitaker*, 199 A.3d at 1027 (quoting *Barros*, 180 A.3d at 829). This Court has further observed that a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hazard*, 64 A.3d at 757 (quoting *Brown v. State*, 964 A.2d 516, 529 (R.I. 2009)).

In *Hazard*, this Court was presented with a similar issue concerning the disclosure of a defendant's mental health records and "whether trial counsel's deficient performance was so prejudicial that [Hazard] was deprived of a fair trial."

*Hazard*, 64 A.3d at 753, 757. During the postconviction-relief hearing, Hazard "explained that his trial counsel had requested his authorization to release his mental-health treatment records" and that trial counsel "never informed him that this material would be provided to the prosecutor." *Id.* at 755. The postconviction-relief justice conducted her analysis in accordance with *Strickland* and determined that "trial counsel's conduct in relation to the disclosure of [defendant's] psychiatric records fell below an objective standard of reasonableness, thus satisfying the first prong" under *Strickland*. *Id.* at 756-57.

After our review of the *Hazard* record, this Court concluded that there was "other compelling evidence of [Hazard's] guilt that was more than sufficient for the jury to convict [him] beyond a reasonable doubt." *Hazard*, 64 A.3d at 758 (quoting *Brown*, 964 A.2d at 541). Accordingly, we held that Hazard failed to meet his "burden of showing with reasonable probability that, but for the alleged errors, the result of his trial would have been different." *Id.*

Like *Hazard*, the record before us contains an overwhelming amount of evidence against LeFebvre, including damaging admissions she made from the outset. *See Hazard*, 64 A.3d at 758. In the trial justice's postconviction-relief decision, the trial justice recounted the testimony of several witnesses from trial. For instance, the state's witness, Sergeant Carl Weston (Sergeant Weston) of the Providence Police Department assigned to the Youth Services Bureau testified that

after LeFebvre was read her *Miranda* rights,[6] she voluntarily provided a statement and admitted that she shook James.  Sergeant Weston testified concerning his observations of LeFebvre, and described her demeanor during this interview as "[f]lat and very matter of fact, * * * no emotion, lack of emotion."  A DCYF child protective investigator, Bridget Crook (Crook), also testified about her observations of LeFebvre during a separate interview and stated that LeFebvre expressed "feeling depressed" and admitted that she "ha[d] a short fuse."  More notably, Crook testified that, when she asked LeFebvre who was to blame for James's injuries, LeFebvre told her that she, "[h]erself" was to blame for the injuries.  Finally, several other witnesses testified at trial, including Dr. Goldberg, whose testimony the trial justice found "compelling and highly credible," regarding the infant's injuries.

We are mindful that, as discussed *supra*, LeFebvre was given fair warning that if she testified and offered testimony inconsistent with her statements in the medical records, LeFebvre would open the door to rebuttal evidence, including the information contained within the medical records.  As the trial justice stated, "[t]hat is exactly what happened."  The trial justice noted that "[defense] counsel had good reason to hope for an amendment to the charge" because "the evidence against [LeFebvre] overwhelmingly supported the [s]tate's claim that [LeFebvre] committed first-degree child abuse on her infant son."

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

LeFebvre's trial testimony also added to the overwhelming evidence of guilt. The trial justice considered LeFebvre's credibility and, based on her observations, she found LeFebvre "detached" and "unemotional" and concluded that her testimony of events lacked credibility and did not align with that of the state's witnesses. For example, LeFebvre testified that she did not recall ever shaking James, which was contrary to the statement she made to Sergeant Weston.

In denying LeFebvre's application for postconviction relief, the trial justice noted:

> "[I]n light of * * * Le[F]ebvre's poor chance for an acquittal at trial, [the] [c]ourt cannot conclude that the strategy was ill advised and certainly not tantamount to ineffective assistance of counsel. This is particularly the case because the evidence against * * * Le[F]ebvre was so strong, her pretrial statements were so damaging, and her version of how the injuries were sustained was so lacking in credibility."

The trial justice particularly found that "it [was] not reasonably probable that *but for* the production of those records [LeFebvre] would have been acquitted." (Emphasis added.)

Although damaging to LeFebvre's case, we are of the opinion that the medical records amounted to cumulative evidence. Had defense counsel refrained from disclosing the medical records to the state, we conclude that the outcome of LeFebvre's trial would not have been different. *See Whitaker*, 199 A.3d at 1027. As such, the trial justice did not err in finding that defense counsel's representation did

not amount to a "deprivation of [LeFebvre's] right to a fair trial." *Id.* (quoting *Barros*, 180 A.3d at 829).

Despite satisfying the first prong under *Strickland*, LeFebvre has failed to demonstrate on appeal that the trial justice erred in finding that defense counsel's production of the medical records to the state deprived her of a fair trial. *See Whitaker*, 199 A.3d at 1027. As discussed *supra*, even if the medical records were excluded and never presented at trial, "there [was] an abundance of other compelling evidence of [LeFebvre's] guilt that was more than sufficient for the jury to convict * * *." *Hazard*, 64 A.3d at 758 (internal quotation marks omitted). With respect to the medical records, we affirm the trial justice's finding that LeFebvre failed to meet the second prong under *Strickland* and in denying LeFebvre's application for postconviction relief.

**Defense Counsel's Failure to Consult and Present an Expert Witness**

***Strickland's* Objective Standard of Reasonableness Prong**

It is well settled that this Court "will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Atryzek*, 268 A.3d at 41 (quoting *Chapdelaine*, 32 A.3d at 941). Moreover, "[t]he admissibility of evidence, expert opinion or otherwise, 'rests within the sound discretion of the trial justice and will not be disturbed on

appeal absent an abuse of that discretion.'" *Riley v. Stone*, 900 A.2d 1087, 1092 (R.I. 2006) (quoting *Morra v. Harrop*, 791 A.2d 472, 476 (R.I. 2002)); *see also State v. Robinson*, 297 A.3d 80, 92 (R.I. 2023). This Court has stated that an "expert witness must testify that the opinions offered rise to the level of reasonable medical certainty, that is, some degree of positiveness or probability and *not possibility*." *Riley*, 900 A.2d at 1092 (emphasis added). "If the expert has testified with the requisite degree of positiveness, 'his or her testimony is admissible and issues relative to the weight of the evidence are left to the fact-finder.'" *Id.* (quoting *Morra*, 791 A.2d at 477).

As a preliminary matter, we note that the trial justice acknowledged in her decision that there exists a threshold question of whether the Superior Court would have granted defendant's request for funds to retain the services of an expert witness. The record reveals that during the course of her representation, defense counsel was clear with LeFebvre that she qualified for the services of the Public Defender if she so wished. Indeed, LeFebvre initially was screened and deemed eligible for indigent representation, but opted to retain private counsel. When passing upon LeFebvre's application for postconviction relief, the trial justice assumed that funds to retain an expert witness would have been provided had defense counsel made such request.

Before this Court, LeFebvre suggests that at the time of trial, there was a dispute within the scientific community concerning the diagnosis of abusive head trauma, and therefore LeFebvre argues that "any competent trial counsel" would

- 24 -

have been aware of the controversy, and presented expert testimony. Thus, LeFebvre argues that defense counsel's performance was deficient and fell below the objective standard of reasonableness by failing to consult with an expert witness regarding abusive head trauma—let alone, present one at trial.

Contrary to LeFebvre's argument that defense counsel failed to consult with a medical expert, the record reflects that defense counsel did, in fact, communicate with potential experts in preparation for trial. At the postconviction-relief hearing, defense counsel testified that she "spoke to three, maybe four, experts talking about potentially retaining them for the case." Although defense counsel could not recall the exact number, she testified that she sent one or two of the potential experts some portions of the medical records in this case.

The record does not indicate how many documents defense counsel submitted to each potential expert witness; nor does the record reveal whether these experts had formed any opinions regarding the medical condition of James and the causation of his injuries. Nonetheless, we decline to speculate about the quantity of information exchanged between defense counsel and any expert witnesses; and instead conclude that, contrary to LeFebvre's appellate argument, the record contains sufficient evidence that defense counsel did consult with several potential experts in preparation for trial.

Finally, we note that LeFebvre has not presented any evidence of any potential witness who could render an opinion contrary to the evidence in this case. As discussed *supra*, the trial justice noted in her decision that "the [c]ourt ha[d] the benefit of analyzing the testimony of Dr. Scheller * * *." After Dr. Scheller testified, the trial justice observed that "[s]itting as a gatekeeper, facing a *Daubert* challenge, th[e] [c]ourt would have concluded that Dr. Scheller failed to provide *a scientifically valid and reliable opinion to challenge the strength of Dr. Goldberg's contention* that [James] did not sustain his multiple injuries from an accidental short-fall." (Emphasis added.) Based on our review, we reach the same result as the trial justice. Accordingly, we are of the opinion that the trial justice did not overlook or misconceive material evidence when she rejected LeFebvre's argument that defense counsel's failure to consult and present an expert at trial deprived her of the effective assistance of counsel.

We hold that LeFebvre does not satisfy the first prong under *Strickland*. *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."). Consequently, our holding serves to defeat defendant's claim of ineffective assistance of counsel, and we need not reach *Strickland's* prejudice prong, based on our longstanding requirement that "[a]n applicant must satisfy *two* criteria to prevail on a claim of ineffective assistance of

counsel." *Whitaker*, 199 A.3d at 1027 (emphasis added). Accordingly, we affirm the trial justice's decision denying LeFebvre's application for postconviction relief. *See Robinson*, 297 A.3d at 92 ("The trial justice's ruling will be sustained provided that his or her discretion 'has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action * * *.'") (quoting *State v. Gaspar*, 982 A.2d 140, 154 (R.I. 2009)).

## Conclusion

For the reasons set forth herein, we quash the writ of certiorari and affirm the judgment of the Superior Court. The record in this case is remanded to the Superior Court with our decision endorsed thereon.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Danielle LeFebvre v. State of Rhode Island. |
| **Case Number** | No. 2020-167-M.P.<br>(PM 19-3924) |
| **Date Opinion Filed** | May 21, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For Appellant:<br><br>Angela M. Yingling<br>Rhode Island Public Defender |
| | For Appellee:<br><br>Christopher R. Bush<br>Department of the Attorney General |